**In re James D. LAWSON, II, Debtor.**

**Bankruptcy No. 88 B 05179.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Dec. 5, 1988.

Neil F. Hartigan, Atty. Gen. of Illinois by Richard K. Nowell, Revenue Litigation Div., Chicago, Ill., for Scholarship Com'n.

Robert Marsh, Wheaton, Ill., for debtor.

Jack McCullough, Chicago, Ill., Chapter 13 trustee.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

This case is before the court for confirmation of the debtor's Chapter 13 plan, a matter within the core jurisdiction of the court pursuant to 28 U.S.C. § 157(b)(2)(L). For the reasons stated below, confirmation is denied, on the ground that the plan unfairly discriminates between two classes of unsecured claims.

Findings of Fact

On March 26, 1988, James D. Lawson, II, filed a petition for relief under Chapter 13 of the Bankruptcy Code, Title 11, U.S.C. ("the Code"). According to the schedules attached to his petition, Lawson is a radio broadcaster, working two jobs, with no dependents. The schedules also indicate that, in March, Lawson had secured debt on two automobiles, and unsecured debt of $25,-868, including student loans of $7,331. Lawson proposed to discharge his debts through a 60 month plan, providing a 10% payment to all of the unsecured creditors.

On May 4, 1988, a proof of claim was filed by the Illinois State Scholarship Commission (the "Scholarship Commission"), stating that the amount Lawson owed on his student loans was $7,646.72. The documents attached to the proof of claim reflect (1) that Lawson executed three $2,500 notes, guaranteed by the State of Illinois, to finance his education at a small private college during the 1982–83, 1983–84, and 1985 school terms, (2) that Lawson executed another note, in January of 1986, consolidating the prior loans, and requiring payment of the $7,500 principal, at 9% interest, in equal installments over 120 months, and (3) that the 1986 note was later endorsed over to the Scholarship Commission. It appears that Lawson made 14 of the monthly payments on the note, but made no payments after April, 1987.[1] It also appears that the proof of claim calculated the interest due on the note as of the date the proof was prepared rather than the date the petition was filed.[2]

---

1. The proof of claim includes documentation to the effect that the principal due on the 1986 note had been reduced to $6,935.89, which would have required 14 monthly payments, but that interest was owed from May 1987 forward.

2. The documentation attached to the proof of claim calculates interest through May 4, 1988; the petition, as noted above, was filed on March 26. Under Section 502(b)(2) of the Code, if an objection is made, a claim is to be allowed only "as of the date of the filing of the petition" and not for "unmatured interest."

On June 28, 1988, Lawson filed an amended set of schedules and an amended plan. The schedules show monthly take-home pay of $1,724.40 and monthly expenses of $1,415; the plan proposes that one of the automobiles be surrendered, and provides for 60 monthly payments of $309. The most significant change is that the plan now classifies the unsecured debt. While all other unsecured creditors would continue to be paid 10% of their claims, the student loan is now proposed to be paid in full. If the amended plan had provided for all of the unsecured creditors to be paid pro rata, without classification, each creditor would have received a payout of about 37%.[3]

The amended plan came before the court for a confirmation hearing on August 25, 1988. The standing trustee recommended confirmation, there were no objections, and the debtor did not appear. Prior to the hearing, the court questioned whether the classification of unsecured debt proposed by the plan conformed to the requirement of Section 1322(b)(1) of the Code, and allowed the parties an opportunity to submit authority on the question. The standing trustee and the Scholarship Commission submitted such authority. The debtor did not. No party submitted any evidence on the issue. The court took the matter under advisement, and, pending the court's decision, Lawson has made the payments proposed by his amended plan.

Conclusions of Law

■ Under Section 1324 of the Code, the court "shall" hold a hearing on confirmation of a Chapter 13 plan, and parties in interest "may" object to confirmation. Thus, the court has the duty of reviewing proposed Chapter 13 plans, at a confirmation hearing, whether or not there is any objection to confirmation. *In re Chaffin* 836 F.2d 215, 216 (5th Cir.1988) ("[t]he Court has the authority and duty to exam-

ine a plan even when no creditor has objected ..."); *In re Harris,* 62 B.R. 391, 393 n. 1 (Bankr.E.D.Mich.1986); *In re Bowles,* 48 B.R. 502, 505 (Bankr.E.D.Va.1985). Lawson's amended plan in this case is therefore subject to the court's independent scrutiny.

Section 1325(a) of the Code sets forth six requirements for confirmation of Chapter 13 plans; the first of these requirements is relevant here. Section 1325(a)(1) provides that a plan must comply "with the provisions of this chapter and with the other applicable provisions of this title," and so incorporates the provisions of Chapter 13 dealing with classification of claims, Sections 1322(b)(1) and (a)(3). These sections read, in pertinent part, as follows:

(b) Subject to subsections (a) and (c) of this section, the plan may—(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated....

(a) The plan shall—(3) if the plan classifies claims, provide the same treatment for each claim within a particular class.

Lawson's amended plan, on its face, raises a question of compliance with Section 1322(b)(1). The plan both designates classes of unsecured claims, and discriminates between them: the claim of the Illinois Scholarship Commission, based on Lawson's unpaid student loans, is to be paid in full; all other unsecured claims are to be paid 10%. The question is whether this discrimination is "unfair," so as to violate Section 1322(b)(1) and thus preclude confirmation under Section 1325(a)(1).

**The test of fairness.** The Bankruptcy Code does not provide any definition of the phrase "discriminate unfairly," as used in Section 1322(b)(1), and the decisions applying the section have not been consistent. *See* 3 Norton Bankr.L. & Prac. § 74.04 (1987 printing) (collecting cases). Part of the reason for this disparity in the deci-

---

**3.** The total to be paid under the amended plan is $18,540 (60 monthly payments of $309). Ten percent of this amount would be consumed in trustee's fees, leaving $16,686 available to pay claims. As scheduled by Lawson, the secured debt on his remaining automobile would consume $7,154.50 of this amount and $9,531.50

would remain for unsecured debt, scheduled by Lawson at $25,868.47 (including the student loans), allowing for repayment of 36.85% of this debt. Depending on the actual claims filed and allowed, this ratio could either increase or decrease.

sions may be the rather imprecise test that many of the decisions have employed to assess the fairness of a discriminatory classification. As noted in *In re Todd*, 65 B.R. 249, 253 (Bankr.N.D.Ill.1986):

> The four factors most often used by the bankruptcy courts in determining whether a classification is unfairly discriminatory are:
>
> (1) Whether the discrimination has a reasonable basis;
>
> (2) Whether the debtor can carry out a plan without such discrimination;
>
> (3) Whether such discrimination is proposed in good faith;
>
> (4) Whether there is meaningful payment to the class discriminated against.

*See In re Bowles*, 48 B.R. 502 (Bankr.E.D.Va.1985); *In re Ratledge*, 31 B.R. 897 (Bankr.E.D.Tenn.1983); *In re Dziedzic*, 9 B.R. 424 (Bankr.S.D.Tex.1981); *In re Kovich*, 4 B.R. 403 (Bankr.W.D.Mich.1980).

There are several difficulties with this "four factor" test, some of which are noted in *In re Furlow*, 70 B.R. 973, 977–78 (Bankr.E.D.Pa.1987), and *In re Green*, 70 B.R. 164, 166 (Bankr.W.D.Ark.1986). Perhaps most significantly, the third factor, which questions the good faith underlying a proposed classification, is repetitive of a distinct requirement for confirmation, under Section 1325(a)(3), that a plan be "proposed in good faith and not by any means forbidden by law." As noted later in this opinion, the good faith requirement of Section 1325(a)(3) has itself generated a complex body of law, and there is no apparent reason to consider good faith separately in determining whether a classification of unsecured debt is unfairly discriminatory. *Furlow*, 70 B.R. at 977 ("To bring all of [the 'good faith'] factors into the analysis of an 'equal treatment' question is to invite a long and complex opinion, with a maximum of inappropriate subjective analysis...."); *Green*, 70 B.R. at 166 ("The factor of whether the discrimination is proposed in good faith is subsumed in the concept of good faith of the plan in general.").

Next, the second factor of the test, requiring that a proposed classification of unsecured debt be necessary for completion of a plan, is overly restrictive. *Green* suggests that almost any plan proposing a discriminatory classification could also be carried out with equal treatment, 70 B.R. at 166, and even cases employing the four factor test have approved discriminatory classifications without finding that the plans were likely to fail if the discrimination were not allowed. *See, e.g., In re Todd*, 65 B.R. 249, 253 (Bankr.N.D.Ill.1986) (discrimination in favor of debt cosigned by fellow worker approved because fellow worker otherwise "might put indirect pressure" on the debtor); *In re Ratledge*, 31 B.R. 897, 900 (Bankr.E.D.Tenn.1983) (refusing to apply the second factor where a particular unsecured creditor is being discriminated against, because "the second test ... is important mostly to show when there is a strong reason to *favor* an unsecured claim"). Thus, *Furlow* probably reflects the reality of the decisions in suggesting that "it should not be necessary for the debtor to show that every form of different treatment of claims is a matter of life or death for the Plan." 70 B.R. at 977.

Finally, the fourth factor of the test focuses on the treatment accorded to the class discriminated against. However, as *Green* points out, this is necessarily "a part of the consideration of whether the discrimination has a reasonable basis." 70 B.R. at 166. In the end, then, the test for unfair discrimination should be limited to the reasonableness of the proposed discrimination between classes of unsecured creditors, as both *Green*, 70 B.R. at 166, and *Furlow*, 70 B.R. at 978, suggest.

However, even this focus leaves application of the test uncertain, since one can only determine whether a discrimination is reasonable in relation to the interests it is supposed to advance. Thus, in formulating a test for reasonableness of legislation challenged under the Equal Protection Clause, the Supreme Court has examined the legislation "to determine whether it rationally furthers some legitimate, articulated state purpose." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d

16 (1973); *cf. Doe v. Edgar,* 721 F.2d 619, 622 (7th Cir.1983) (policy of state official "will be upheld if it bears a rational relationship to a legitimate governmental interest"). The test for reasonableness in discriminatory classifications in Chapter 13 plans likewise requires a definition of the interests that may properly be served by the discrimination.

**The permissible interests.** To determine the interests that may properly be served by a discrimination between classes of unsecured creditors, it is helpful to review the history of Section 1322(b), which permits this classification. It should first be recognized that any classification of unsecured debt is an exception, the general rule in bankruptcy being that claims of like priority are to be given like treatment. *See In re Davidson,* 72 B.R. 384, 387 (Bankr.D. Colo.1987) ("[t]he Code presumes that creditors of like position will be treated equally.") This rule is reflected in the provisions for distribution under Chapter 7 of the Code; Section 726(b) requires that payments "shall be made pro rata among claims of the kind specified in each particular paragraph [specifying priority]." Precode law upheld the same principle. *See, e.g., Drybrough v. Ware (In re Bavarian Brewing Co.),* 111 F.2d 548, 550 (6th Cir. 1940) (holding that, where available funds cannot satisfy all claims of a particular class, the funds "must be applied to their payment pro rata and without preference.") The principle of non-discrimination was also the rule for unsecured claims under the predecessor of present Chapter 13. Pursuant to Section 646(1) of the Bankruptcy Act, 11 U.S.C. § 1046(1), a Chapter XIII plan was required to "include provisions dealing with unsecured debts generally." This was interpreted to mean that *"all* unsecured debts must be dealt with, and they must be dealt with in the *same* way." 9 Collier on Bankruptcy ¶ 28.02 (14th ed. 1974) (emphasis in original); *In re Bailey,* 188 F.Supp. 47, 49 (N.D.Ala.1960); *In re Heger,* 180 F.Supp. 147, 148 (D.Minn.1959).

In the drafting of the Code, there was at least one legislative proposal that would largely have retained the requirement of non-discriminatory treatment for unsecured claims in individual's plans. A bill drafted by the National Conference of Bankruptcy Judges, and introduced as H.R. 32 in the Ninety–Fourth Congress, employed in its Section 6–301(1) the same language as Section 646(1) of the Bankruptcy Act, excepting from "general" treatment only specified unsecured debts. A competing bill, H.R. 31, drafted by the Commission on the Bankruptcy Laws of the United States, in its Section 6–201(1), allowed plan provisions "dealing with unsecured claims generally, *or by classes*" (emphasis added).[4] In the hearings on these bills, the restrictive classification provisions of the old law and of the proposed H.R. 32 were criticized by a representative of the National Association of Chapter XIII Trustees, Claude Rice:

> [T]he Commission bill proposes that the unsecured creditors may be dealt with generally, or 'by classes' in a plan or arrangement with the creditors.

> The Judges [sic] bill omits 'by classes.' The Judges' proposal just continues the problem we now have in the present act, which requires all general unsecured creditors be treated alike.

> It would be a welcome improvement to be able to handle it by classes....

> ....

> [O]ne short point to emphasize the need for that. I think the absence of that option at present is a substantial hindrance to the use of the proceeding because the present statute requires (1) a deficiency judgment on foreclosed real estate mortgages that was [sic] foreclosed on the second owner after the debtor sold the house; (2) a $50 NSF check debt subject to prosecution if not paid promptly; (3) back child support; (4) a doctor bill for the doctor who is still treating his pregnant wife—all to be treated exactly alike. There is no way where a debtor is

---

**4.** For the text of both bills, see *Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary, House of* *Representatives,* 94th Cong., 1st Sess., Appendix, at 212, *reprinted in* 7 Resnick & Wypyski, Bankruptcy Reform Act of 1978: A Legislative History (1979).

going to get himself into a bind where he has to treat all those people in exactly the same fashion.

*Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary, House of Representatives,* 94th Cong., 1st Sess. 1425–26 (1976) (statement of Claude Rice), *reprinted in* 5 Resnick & Wypyski, Bankruptcy Reform Act of 1978: A Legislative History (1979).

During Mr. Rice's remarks, one of the committee staff members noted that a representative of the National Conference of Bankruptcy Judges had earlier indicated the Conference's concurrence that treatment by classes ought to be allowed. *Id.* Thereafter, all of the drafts considered by Congress provided for classification, without pertinent comment in the committee reports; the language prohibiting unfair discrimination between classes was first added in H.R. 8200, 95th Cong., 1st Sess., *reprinted in* 12 Resnick & Wypyski, Bankruptcy Reform Act of 1978: A Legislative History (1979).

█ Based on this history, sparse as it is, the possibility of classifying unsecured debt appears to have been added to Chapter 13 for the benefit of the debtor. The provisions actually placed by Congress in Chapter 13 certainly make classification an option of the debtor. Pursuant to Section 1321, only the debtor may propose a plan in Chapter 13, and Section 1322(b) includes classification of unsecured claims as one of the provisions that the debtor "may" include in a plan, as opposed to the mandatory provisions of Section 1322(a). Similarly, Section 1322(a)(3) requires that all claims within a given class be treated alike, but it applies only "if the plan classifies claims." The relevant interests, then, in considering whether a classification is unfairly discriminatory, should be the interests of the debtor, rather than interests of particular creditors or public policies that do not impact the debtor directly.

At the same time, it could hardly be contended that, under Section 1322(b)(1), a Chapter 13 debtor may choose to advance *any* personal interest by discriminating in the treatment of unsecured creditors; that could lead to approval of discrimination on purely personal grounds, like family relationship and friendship. The examples given by Mr. Rice in his testimony to Congress were ones in which the debtor's objective interests, either in bankruptcy—in completing the plan and in obtaining a fresh start —or in maintaining a decent quality of life, might reasonably be advanced. The inability to retain the services of the doctor currently providing critical health care could lead to ineffective treatment, devastating the debtor's family and possibly rendering performance under the plan impossible; criminal prosecution for negotiating a non-sufficient funds check could have the same impact; failure to pay child support arrearages, since that debt is not dischargeable in Chapter 13 (pursuant to Section 1328(a)(2)), could leave the debtor at the completion of his plan still substantially in debt. Thus, at least in some situations, disproportionately large payments to doctors, holders of NSF checks, or a former spouse, would be reasonably related to articulable, legitimate interests of the debtor.

█ With this understanding of the relevant interests, the following should be the test under Section 1322(b)(1) for discrimination in the classification of unsecured debt: a discrimination is "fair," and therefore permissible, to the extent, and only to the extent, that it rationally furthers an articulated, legitimate interest of the debtor.

**Application of the test.** The decisions are in agreement that the debtor in a Chapter 13 case has the burden of establishing the fairness of a discriminatory classification of unsecured debt. *In re Cook,* 26 B.R. 187, 190 (D.N.M.1982) (placing burden of showing fairness of classification on debtor is "consistent with the general burden on the Chapter 13 debtor to show that the proposed plan ought to be confirmed"); *In re Davidson,* 72 B.R. 384, 387 (Bankr.D. Colo.1987); *In re Gibson,* 45 B.R. 783, 788 (Bankr.N.D.Ga.1985). As noted above, the debtor in the present case, James Lawson, made no presentation in support of the classification of his student loan debt; in-

deed, when Lawson's counsel was asked by the court at a status hearing whether he wished to brief the issue, counsel merely asked for an opportunity to submit an amended plan, if necessary, to conform to the court's decision. However, the Scholarship Commission and the standing trustee have argued the fairness of the discrimination, and, since the Commission is the principal beneficiary of the discrimination and the trustee is required to "appear and be heard at any hearing that concerns ... confirmation of a plan" (Section 1302(b)(2)(B)), these parties may properly assume the debtor's burden here. Thus, the Commission and the trustee must articulate some legitimate interest of Lawson and show that it is rationally advanced by making full payment of Lawson's student loans, while other unsecured creditors receive 10% payment of their claims.

The argument made by the Commission and the trustee, implicit from the cases they cite, attempts to show the fairness of Lawson's classification by making the following points: (1) Lawson's student loans would not be dischargeable in a Chapter 7 liquidation, pursuant to Section 523(a)(8) of the Code; (2) an attempt by a debtor to discharge through a Chapter 13 plan claims that could not be discharged in Chapter 7 subjects the plan to challenge as not having been proposed in good faith, pursuant to Section 1325(a)(3); and (3) paying the student loans in full therefore avoids a potential denial of confirmation, and so furthers Lawson's legitimate interests in completing a plan and discharging his debts.

The difficulty with this argument is in its second point, dealing with good faith. It is likely that Lawson's student loans would not have been dischargeable in a Chapter 7 liquidation, pursuant to Section 523(a)(8).[5] The loans were guaranteed by a governmental unit for educational purposes, and

first became due less than five years before Lawson filed his petition in this case. None of the facts presented in Lawson's schedules suggest that excepting his student loans from discharge would impose an undue hardship on him, and he has no dependents. However, it does not follow from the nondischargeability of the student loans under Section 523 that Lawson could not have filed, in good faith, a plan seeking to discharge the loans on a pro rata basis with his other unsecured debt.

**The measure of good faith.** "Good faith," in Chapter 13, is another area of interpretive difficulty, as described in *In re Easley*, 72 B.R. 948, 950 (Bankr.M.D.Tenn. 1987):

> The Bankruptcy Code does not define 'good faith.' There is no illuminating legislative history. More than 300 reported 'good faith' decisions form a maze of rules and exceptions swallowing rules. Nearly identical fact patterns have produced inconsistent results within judicial districts and across the circuits. The reported decisions demonstrate that 'good faith' is an illusive statutory description of the limits of Chapter 13 relief.

Nevertheless, in this circuit, there are three particularly relevant "good faith" decisions, which set down the principles that are dispositive here: *In re Rimgale*, 669 F.2d 426 (7th Cir.1982); *In re Madison Hotel Associates*, 749 F.2d 410 (7th Cir. 1984); and *In re Smith*, 848 F.2d 813 (7th Cir.1988). Those principles can be summarized as follows:

1. There are two sources for a requirement of good faith in Chapter 13. One is the express language of Section 1325(a)(3), imposing, as a requirement for confirmation, that a plan be "proposed in good faith and not by any means forbidden by law."

---

**5.** Section 523(a)(8) provides:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution, unless—

(A) such loan first became due before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or
(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

This requirement focuses on "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Madison Hotel*, 749 F.2d at 425. The other source is implicit in Section 1307(c), which allows dismissal of a case for "cause." The language of Section 1307(c) is essentially the same as that of Section 1112(b), which allows dismissal of Chapter 11 cases for "cause." *Madison Hotel*, in describing Chapter 11, notes that "[i]t is generally recognized that 'good faith' is a threshold prerequisite to securing ... relief, and that the lack of such good faith constitutes 'cause' sufficient for dismissal." *Id.*, at 426. Under this second "good faith" requirement, the focus is on the debtor's conduct prior to filing, and his or her motivation for seeking bankruptcy relief. *See In re March*, 83 B.R. 270, 275 (Bankr.E.D.Pa.1988) (consideration given to good faith in filing Chapter 13 petition as distinguished from good faith in proposing plan). However, when a "good faith" challenge is first raised after a plan is proposed, there will often be overlap in the consideration of the two issues. *Smith*, 848 F.2d at 816 n. 3, quoting *March*, 83 B.R. at 275.

■ 2. No comprehensive definition of "good faith" is possible; rather, the bankruptcy courts must define good faith "on a case-by-case basis as the courts encounter various problems in the administration of Chapter 13's provisions." *Rimgale*, 669 F.2d at 431. However, several factors may guide the court's inquiry into good faith, including: (a) whether there are any deficiencies or inaccuracies in the debtor's schedules or plan that might "amount to an attempt to mislead the bankruptcy court"; (b) whether the payments proposed by the plan are fundamentally fair in dealing with creditors (including consideration of the timing of the bankruptcy filing, the amount and proportion of debt that would not be dischargeable in a Chapter 7 liquidation, and the equities of any classification); and (c) whether the debtor had any improper motivation in seeking relief, as indicated, in part, by the circumstances under which the debts were incurred. *Rimgale*, 669 F.2d at

431 n. 14, 432–433, 433 n. 22. These factors, and factors suggested by other courts, coalesce into a "totality of circumstances" test through which a bankruptcy court must determine "whether or not there has been abuse of the provision, purpose, or spirit of [Chapter 13] in the proposal." 9 Collier on Bankruptcy ¶ 9.20 at 319 (14th ed. 1978), quoted in *Smith*, 848 F.2d at 818, *Rimgale*, 669 F.2d at 431, and *In re Terry*, 630 F.2d 634, 635 (8th Cir.1980).

3. There is now a reduced need for courts to consider, as part of the general good faith inquiry, whether the amounts to be paid under a Chapter 13 plan are meaningful or whether multiple filings indicate an improper purpose on the debtor's part, since these issues were specifically dealt with by Congress in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984) ("BAFJA"), which added the present Sections 1325(b)(1)(B) and 109(g)(2) to the Code. However, with these exceptions, the totality of circumstances test remains completely applicable. *Smith*, 848 F.2d at 819–21.

■ 4. The attempt by a debtor to discharge, through a Chapter 13 plan, a debt that would not be dischargeable in a Chapter 7 liquidation does not, in itself, taint the plan with bad faith. In *Rimgale*, the Seventh Circuit first explained that, pursuant to Section 1328 of the Code, Congress allowed a discharge, upon the completion of a Chapter 13 plan, "of virtually all debts provided for in the plan or disallowed," as "as an incentive for debtors to complete performance." 669 F.2d at 428. The Court then held that "good faith" cannot "be defined as the absence of conduct that would traditionally have barred discharge, without rendering Chapter 13's discharge provisions nugatory." *Id.*, at 431–32. In *Smith*, the Court pointed to other Congressional action in further support of this holding:

At the time this court decided *Rimgale*, Congress had already legislated specifically that certain debts are nondischargeable in Chapter 13. See 11 U.S.C.

§ 1328(a)(1), (2) (alimony and child support) and 42 U.S.C. § 294f(g) (Health Education Assistance Loan Program Act loans). 'Congress could have easily added more exceptions to the list in § 1328(a) had it so intended. Absent some other evidence of lack of good faith, therefore, merely seeking the benefit of § 1328(a) does not stamp the debtor's application with bad faith.'

848 F.2d at 818–19 (quoting *In re Chaffin*, 816 F.2d 1070, 1074 (5th Cir.1987), *modified on reconsideration on other grounds*, 836 F.2d 215 (5th Cir.1988) (footnote omitted)). Thus, "[a]lthough the debtor's motive in invoking Chapter 13 solely to obtain discharge of a ... non-dischargeable debt, as well as the circumstances under which that debt arose, may be factors to consider as part of the totality of the circumstances, they cannot, as a matter of law, suffice to show bad faith." *Smith*, 848 F.2d at 818 (quoting *Chaffin*, 816 F.2d at 1074).

This last point is dispositive here. Even if a debtor filed a Chapter 13 petition solely to avoid a student loan that could not be discharged in Chapter 7, this motivation would not, under *Smith* and *Rimgale*, be a sufficient basis for a finding of bad faith, something more is required. *In re Doersam*, 849 F.2d 237 (6th Cir.1988), provides an example of the sort of additional factors that might support a finding of bad faith. In *Doersam*, the debtor was liable for $15,-000 in student loans, 81% of her total unsecured debt, and filed a Chapter 13 petition before the first payment on her student loans was due, indeed, before she even graduated. 849 F.2d at 238. Moreover, the debtor scheduled, as part of her expenses, support for a working daughter and minor grandchild for whom she was not legally responsible. 849 F.2d at 240. Finally, as noted in the bankruptcy court decision denying confirmation, the debtor

proposed a 36 month plan, paying her unsecured creditors 19%, rather than the higher amount that a 60 month plan would have allowed. *In re Doersam*, 60 B.R. 130, 131 (Bankr.S.D.Ohio 1986). Under these circumstances, a finding of bad faith could be predicated on findings both that the debtor incurred her student loans without intending to repay them and that she attempted to mislead the court in scheduling her expenses.[6]

The present case presents no basis for such findings of bad faith. Unlike the debtor in *Doersam*, Lawson made payments on his student loans for over a year before he filed his bankruptcy petition, so that there is no indication that he incurred the debt with intent to avoid its repayment through Chapter 13, and the unpaid balance on his student loans is only about a third of his total unsecured indebtedness, so that there is no reason to believe that Lawson filed his bankruptcy petition solely to avoid his student loan obligations. Lawson chose to offer payments to his creditors over the maximum 60 month period, and no challenge has been made either to the accuracy of Lawson's statement of income and expenses or to the computation of his plan.

Indeed, of all the "good faith" factors noted in *Rimgale* and *Smith*, only one besides the nondischargeable nature of the Lawson's student loans in Chapter 7 is relevant here: the equities of classifying those loans together with ordinary consumer debt. *Rimgale* suggested that, on remand, the bankruptcy court "may wish to consider," as part of its good faith analysis of a Chapter 13 plan, the equities of paying, at the same level, claims arising out of a scheme to defraud a mentally disturbed widow and other claims that would have been dischargeable in Chapter 7. 669 F.2d

---

**6.** In *Doersam*, the Sixth Circuit affirmed a denial of confirmation, without suggesting that payment of the student loans at a rate higher than other unsecured claims would be an appropriate remedy for the bad faith found. Indeed, where a bankruptcy case itself is filed in bad faith, as part of a scheme to incur debt without

repaying it, no provision of a plan should allow the case to avoid dismissal pursuant to Section 1307(c). And where a plan is proposed in bad faith because expenses are deliberately overstated, the appropriate remedy would appear to be, if not dismissal of the case, submission of an amended plan reflecting the correct expenses.

at 429, 433 n. 22.[7] *Smith* required an examination of the equities of classifying together ordinary consumer debt and claims arising from a fraudulent home repair business. 848 F.2d at 814, 821. If it were inequitable for a Chapter 13 plan to treat claims not dischargeable under Chapter 7, such as student loans, together with debt that is dischargeable under Chapter 7, then Lawson's plan might indeed be compelled, in order to comply with the requirement of good faith, to give preferential treatment to the student loans. However, neither in *Rimgale* nor in *Smith* did the Seventh Circuit itself consider the equities of equal treatment; rather, the Court remanded each case to allow the bankruptcy court to make the determination of the equitableness of equal treatment. For several reasons, this court holds that, in a Chapter 13 plan, treating claims that would not be dischargeable in Chapter 7 equally with other unsecured claims is not inequitable.

**The equities of equal treatment for claims not dischargeable in Chapter 7.** *In re Sanders,* 13 B.R. 320 (Bankr.D.Kan. 1981), was cited in *Rimgale* in support of the suggestion that the equities of equal treatment should be considered by the bankruptcy court. 669 F.2d at 433 n. 22. *Sanders,* therefore, provides an appropriate starting point for consideration of whether a Chapter 13 plan may equitably provide for treatment of claims that are nondischargeable in Chapter 7 on the same basis as claims that are so dischargeable.

*Sanders* involved a Chapter 13 plan dealing with claims that would have been excluded from discharge in Chapter 7 pursuant to what is now Section 523(a)(10) of the Code, because these debts were scheduled in a prior bankruptcy case in which the debtor was denied a discharge. Because the plan proposed to pay these debts on the same terms as other unsecured debts that would have been dischargeable in Chapter 7, the court in *Sanders* denied confirmation. The court reasoned this way: (1) unsecured claims are not required to be

treated the same, but may be classified (13 B.R. at 322); (2) in allowing classification, Section 1322(b)(1) provides that the classification must conform to Section 1122 of the Code (*id.*); (3) Section 1122 allows claims to be placed in a given class only if they are substantially similar (*id.*); (4) claims not dischargeable under Chapter 7 are not substantially similar to claims that are so dischargeable (13 B.R. at 322–23); (5) by treating the two different kinds of claims in the same way, the debtor's plan "attempts to classify in a single class claims that are not substantially similar" (13 B.R. at 323); and (6) the plan therefore "fails to provide uniform and fair treatment to all claimants," in violation of the "good faith" requirement of Section 1325(a)(3) (*id.*).

This reasoning is flawed. It denies the debtor's option, under Chapter 13, to treat all unsecured claims generally, and not by classes, the way that all plans were required to treat unsecured claims under old Chapter XIII. See p. 983, above. As the court noted in *In re Vensel,* 39 B.R. 866, 868 (Bankr.E.D.Va.1984): "Although the debtor may establish separate classifications of creditors which are not unfairly discriminatory, 11 U.S.C. § 1322(b)(1), the debtor is under no obligation to do so and cannot be forced to do so by a creditor." Moreover, even if separate classification of dissimilar unsecured claims were required, nothing in the Code mandates that different classes of claims receive correspondingly different treatment; separate classes of Chapter 7 dischargeable and Chapter 7 nondischargeable claims could be created and given identical treatment without any violation of Section 1122. 3 Norton Bankr. L. & Prac. § 74.04 at 9 (1987 printing). The reasoning of *Sanders* thus does not support its conclusion that Chapter 13 plans lack good faith if they fail to give separate, preferential treatment to claims that would be nondischargeable in Chapter 7.

Nor is there any other basis to support such a conclusion. Some decisions have pointed to the policies that led Congress to

---

7. Although the Court in *Rimgale* did not address the issue, the debts arising out of the fraud would apparently have been nondischargeable in Chapter 7 pursuant to Section 523(a)(2), (4), or (6) of the Code.

make certain debts nondischargeable in Chapter 7 cases as justification for requiring substantial payment of these debts in Chapter 13. For example, the following decisions stress the importance of repaying student loans: *In re Geehan,* 59 B.R. 600, 601 (Bankr.S.D.Ohio 1986) (court "places greater weight" on the nondischargeability of student loans than on the liberal discharge provisions of Chapter 13); *In re Johnson,* 36 B.R. 67, 69 (Bankr.S.D.Ill. 1984) (court "must be careful to guard the public interest" in cases involving student loans); *In re Yee,* 7 B.R. 747, 757 (Bankr.E. D.N.Y.1980) ("No rational legislative policy would totally bar student loans from discharge in straight bankruptcy but permit their avoidance automatically upon payment of a pittance to creditors."). These decisions, however, simply substitute the policy considerations of individual judges for those of Congress. As noted in *Smith,* Congress can expand the list of claims nondischargeable in Chapter 13 should it determine that this is appropriate. Congress has not done so.[8]

On the other hand, there are important considerations indicating that it would be not be appropriate to give preferential treatment in Chapter 13 to debt that would not be dischargeable in Chapter 7. Nondischargeability is not equivalent to full payment. In Chapter 7 itself, the fact that a claim is nondischargeable gives that claim no priority in distribution of the assets of the debtor's estate—nondischargeable claims share the assets pro rata with the other, dischargeable, unsecured claims, pursuant to Section 726(b). It appears inequitable that a claim, simply because it is nondischargeable in Chapter 7, should take a greater share of the assets of the estate available for distribution to creditors in Chapter 13. If this is allowed, it is the other creditors, not the debtor, who would bear the burden of nondischargeability.

Moreover, after a Chapter 7 case is closed, the holder of a nondischargeable claim is far from certain to collect on that claim. As the Seventh Circuit noted in *Smith:*

'[N]ondischargeable' does not equate with 'collectible' and ... often the creditor is practically better off with a partial payment under a Chapter 13 plan than he would be if the Chapter 13 case had not been filed.

848 F.2d at 822 (quoting *In re Gathright,* 67 B.R. 384, 387 (Bankr.E.D.Pa.1986)). It is not equitable to provide the holder of a nondischargeable debt in Chapter 7 with a right to full payment in a Chapter 13 plan when that right does not exist in Chapter 7.

There is also a practical reason for rejecting preferential treatment of nondischargeable debt. In *Rimgale,* the Seventh Circuit ruled that another requirement of Section 1325(a), the "best interests" test of Section 1325(a)(4), would not be violated by a plan that proposed less than full payment of a debt not dischargeable under Chapter 7.[9] In explaining this ruling, the court made the following observation about the effect of a contrary result:

[A]ny creditor with a nondischargeable debt could block a Chapter 13 plan by insisting that his claim might some day be satisfiable in full. Such a creditor would have a virtual veto over a Chapter 13 plan, while ordinary unsecured creditors have not even a vote. The generous discharge provisions of Chapter 13 would be illusory, subject to abrogation whenever a creditor with the sort of claim they cover objected to the plan. As a *quid pro quo* for not objecting, such a creditor might be able to insist on specific levels of repayment, although the statute itself has no explicit minimum payment requirement. In short, this reading of the 'best interests' test undercuts the

---

8. *See In re Rowe,* 17 B.R. 870, 871 (Bankr.E.D. Va.1982), in which the court noted with concern the failure of Congress to address repayment of student loans in Chapter 13, but nevertheless confirmed a plan paying these loans on an equal basis (32%) with other unsecured claims, ending its opinion with an observation that "[a]ny remedy lies with Congress."

9. Section 1325(a)(4) requires, for plan confirmation, that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim [be] not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date."

limiting of creditors' power and the inducement of broad discharges, both integral parts of Congress' revision of Chapter 13.

*Rimgale*, 669 F.2d at 430–31. Any reading of "good faith" in Chapter 13 that requires preferential treatment of debt not dischargeable in Chapter 7 would provide to the holders of that nondischargeable debt precisely the veto-power that the Seventh Circuit warned of. Upon receipt of a Chapter 13 plan proposing to pay them at par with other unsecured claimants, the holders of debt nondischargeable in Chapter 7 could threaten to object to confirmation unless the plan were amended to pay them in full. As long as the courts are willing to require preferential treatment in some cases, this threat is likely to be very effective, since an amendment to pay the preferred creditor in full will cost the debtor very little—the total plan payments remain the same—whereas an objection to confirmation would at least involve additional legal work by the debtor's counsel and delay in confirmation itself.

Finally, there is substantial authority approving payment in Chapter 13 plans of claims that would not be dischargeable in Chapter 7 on the same basis as ordinary unsecured claims. *In re Gibson*, 45 B.R. 783 (Bankr.N.D.Ga.1985) (no bad faith inferred from student loans proposed to be paid pro rata with other unsecured debt in a 6% plan; creditors allowed opportunity to show other factors bearing on good faith); *In re Vensel*, 39 B.R. 866, 868 (Bankr.E.D. Va.1984) (confirming plan in which student loan is treated on par with other unsecured debt); *In re Rowe*, 17 B.R. 870 (Bankr.E.D. Va.1982) (same); *In re Gunn*, 37 B.R. 432 (Bankr.D.Ore.1984) (approving equal treatment of student loan; confirmation denied because of unfair discrimination in favor of secured creditor and other reasons); *In re Chase*, 28 B.R. 814, 818–19 (Bankr.D.Md. 1983) (claims arising out of sexual assault treated on par with other unsecured debt; confirmation denied on grounds that plan proposed for less than five year maximum). Additional authority to the same effect is collected in *Chase*, 28 B.R. at 819.

■ **Conclusion.** For all of the reasons set forth above, a Chapter 13 plan should not be found tainted by bad faith on the basis that it proposes to pay claims that would not have been dischargeable in Chapter 7 on the same basis as other unsecured claims. Therefore, this Court finds that a plan proposing to pay Lawson's unsecured creditors on a pro rata basis would not have been in bad faith, and that accordingly, Lawson had no interest in making disproportionately large payments to the Scholarship Commission. The discrimination in Lawson's plan is thus unfair, in violation of Section 1322(b)(1), and confirmation must be denied pursuant to Section 1325(a)(1).

An order will be entered in accordance with this opinion, allowing the debtor 30 days to propose a plan that does not unfairly discriminate.